Good morning, your honors. I'm from Arizona, and I'm a member of both bars, a member of this bar for some 50 years, and I moved out of Los Angeles in 1957 to become an Arizona lawyer. So I'm back home. As introduction, this is kind of an interesting case because most of the cases that come before the appellate courts have to do with what is a security, and although this case doesn't look like that kind of a case, that's really what it is, what is a security. The appellants here were selling charitable gift annuities, and they got tricked into a company where the starter, the leader, stole some $28 million after some $54 million were raised over a period of some six years. Now, everybody agrees that the appellants had nothing to do with that. They were life insurance company agents, they were life insurance agents, and they worked for some of the biggest life insurance companies in America. But they were trapped into selling or inveigled into selling charitable gift annuities as a sideline because there aren't many charitable gift annuities sold by anyone but the Red Cross, the Salvation Army, UCLA, where I went, and places like that that are charitable institutions. Now, what happened here was the lower court, the district court, held that what was sold here were not CGA's charitable gift annuities, and what was sold here was securities disguised as charitable gift annuities. As a matter of fact, the court found in its amended order supersedious, August 1, 2006 order, that this was a purely legal issue, and it was subject to the law of the case, the law of the case being SEC against Dilley, in which none of these appellants ---- The court said, if recollection serves me correctly, is that the ---- consistent with the holding in Dilley, I'm ruling this way. Now, that's somewhat different from law of the case saying I'm bound by my other case and I have to hold this way. I mean, law of the case is a prudential doctrine saying you're not going to revisit early decisions. So, tell me why you think that the district court was actually applying law of the case in this instance. They said right in the order that this was the law of the case. They said consistent with Dilley, the law of the case is that these are securities that they found in Dilley. I guess I took that a different way, that I didn't think he was necessarily applying the doctrine of law in the case, that he was saying consistent with Dilley, this is what I think the law is in this case. Now, it may not make any difference because the court had the right to revisit it anyway, and we certainly did. But go ahead. Well, we think this was an ancillary case, and law of the case requires that it be the same case with the same parties and the same issues. SEC against Dilley was an enforcement action by the Securities and Exchange Commission against the man who stole $28 million. They weren't concerned at all with these appellants. They weren't even named in the case, either as relief defendants, as they might have been named, or as primary defendants where they weren't named at all. So we don't think that the law of the case doctrine applies here, and that if the court were going to find that CGAs are, in fact, securities, they must find it, in this case, Warfield against Alanace. I have the same question. I'm looking at page 3 of the court's superseding order, and around lines 18 to 20, because the court, after mentioning Dilley, says, for the reasons set forth in the receiver's response, and has a longer name than that, the court finds that the CGAs are securities. So I read that as just saying, I'm looking at this now, again, all over again, and I happen to agree with the receiver, and that's why I'm ruling the way I'm ruling. I don't view it as having felt bound by Dilley. Well, we agree that I read it the other way, and we're of the same opinion that Your Honor has found, that Dilley has nothing to do with this case. Well, that's not what I said, but that's okay. But based upon that, I don't think that the judge could have found as he did find, because he found this, remember, in a supersedious order long before there was a trial. There was no evidence in the case. There were no witness testimony. He merely made an assumption based upon the pleadings here that this was a security. Now, this becomes important because we have people here from California and Massachusetts and Texas and some of the other 146 defendants here who threw in the towel and gave up and paid the receiver and are not here as appellants. But they were from all over the country. And the receiver relied upon Section 27 of the Exchange Act, which says there's worldwide jurisdiction, if you can find the man, any place, if he's violated the Exchange Act. But we have another issue here that I think is even more important than that. The court found that there was a Ponzi scheme here. Now, it looks like a Ponzi scheme, but upon reading the opinion of this court, In re Agricultural Research and Technology Group, Inc., a 1998, a 1990 case, this court said, and this is quoted on page 50 of the Appellee's responsive brief. A Ponzi scheme is an arrangement whereby an enterprise makes payments to investors from the proceeds of later investment rather than from profits of the underlying business venture, as the investors expected. Let's just stop there. Giving money to a charity is not a business venture. And the people who buy CGAs are not giving it to make money. They lose money the minute they get a CGA, because under IRS rules, the CGA can't have a value of more than 50% of what the exchange property is valued at. So they get a haircut immediately. And now it says the underlying business venture. There was no business venture. But the persons who purchased the annuities did expect a return on their investment in the form of certain kind of annuities, tax benefits, and so forth, right? That's not a return, Your Honor. That's getting their capital back. That's not getting earnings. That's not getting profits. That's not getting what people who invest in CGAs expect. It's getting some tax benefits. It's getting a benefit of giving to a charity. Absolutely. Why isn't that sufficient? That's not what a Ponzi scheme is for. A Ponzi scheme is to make money. It's not to get a tax benefit. I've never seen a Ponzi scheme that's advertised, you will get a tax benefit. Ponzi schemes usually start out with, you're going to double your money in a year or two or three. That's how Ponzi came about in 1929. He promised that the people would double their money in several years. In three years, as I recall. That's what a Ponzi scheme is. Now, let's read the rest of this, because it says, The fraud consists of transferring proceeds received from the new investors to previous investors, thereby giving other investors the impression that a legitimate profit-making business exists. You can't have that with a CGA. Well, why not? In the sense of, maybe not strictly, but by analogy, you've got, in essence, as I understand what happened, or alleged to have happened here, your new investors are paying annuities to old investors. And the fund itself, the anticipation was the fund would generate sufficient income and earnings and growth to be able to continue to do that. And then at the end of the period of the death, then it would go to the charity. But during the lifetime of the annuity purchaser, the purchaser expected benefits, expected money, expected a return on investment. Well, if you call it investment, that's true, Your Honor, but we beg to differ. We don't think there's an investment motive here. An investment is where you expect to make more money than you put in. By the very nature of a CGA, you're lucky if you get back some of the money, because there's a fixed payment not based upon earnings. Well, the length of the payment was based on earnings in a sense, right? No, not at all. It's fixed. Not at all is it based on earnings. It's established by the American Council on Gift Giving having to do with longevity, having to do with maturity tables and stuff like that. But it has nothing to do with earnings. The risk is shifted immediately in the CGA from, am I out here? Yes. It goes from the CGA buyer or customer or giver, and the risk is put on the company that issues the CGA immediately. And in that respect, it's like an annuity, a fixed annuity, which have always been exempt securities under the Securities Act. And more so, these rules are fixed not by the Securities Act at all. They're fixed by the Internal Revenue Code. Section 501M5 discusses what is required for a CGA. No place can you find that in the Securities Act. You can't even find the CGA described or defined in the Securities Act. It's defined by the Revenue Code, because when Congress passed the 1995 Philanthropy Protection Act, it was for the purpose of preserving to charities the right to issue CGAs and the right to collect money without being called brokers, dealers, or securities people. And the PPA, of course, is very, very precise in who it covers. It covers the trustees, directors, officers, employees, or volunteers of the charity. Now, we have independent contractors here. Our position is that they're not covered by the PPA at all. And if we read exactly what it says in the congressional record, and I'm appealing to you to read page 124 of the reply brief, appellant's reply brief. Now, this is a 1997 letter from a congressman to the clerk of the House of Representatives. The congressman is Thomas Bliley of the Committee on Commerce, who was one of the persons who sponsored the 1995 PPA. And on page 124, we find this. Public Law 10462, which is the PPA, also amends the Securities Exchange Act of 34 to provide an exemption from that act's broker-dealer provisions for employees or volunteers of charitable organizations or charitable income funds who buy, hold, sell, or trade in securities for the charitable organization or fund, so long as they are volunteers or are engaged in overall fundraising activities of the organization, but receive no commission or other special compensation based on the number or value of donations collected. Now, whether by oversight or otherwise, Congress did not include independent contractors here. They only included people who work for the charities and who are engaged in the overall process of whatever charities do. And they are only those people enunciated in the act, because we have two sections to the act. We have 3E1 and 3E2. And in the first paragraph, they say that these people are exempt from the broker-dealer regulations. And in the second part, they say these people may not collect commissions. Now, it's our position that the independent contractors here are not constrained from collecting commissions. Now, if there's a fraud involved, the SEC has plenty to back it up. It has Section 10B of the Exchange Act, Rule 10B-5. It has Section 17 of the Securities Act. But this is not an action by the SEC. Now, they call it an ancillary action, because it isn't the SEC here. It's Mr. Warfield, the receiver who was appointed, going after people not who violated the Securities Act, but who received money that they shouldn't have gotten, according to Mr. Warfield, because they were commissions. And we take that up in the brief under another section. Now, the jury found that these were not fraudulent conveyances. That's a jury finding. That was put to the jury. And I think we're ‑‑ I think my time is up. It is, counsel. Thank you very much. Could I ask you a question before you leave? I want to go back to this idea of a definition of an investment contract and specifically item number three, profits. I'm still worrying about that issue. And I want to call to your attention the Edwards case, with which I'm sure you're familiar. But the statement made in Edwards, we used profits in the sense of income or return to include, for example, dividends and other periodic payments or the increased value of the investment. It strikes me that that language is broad enough to include the payments that come back and the tax benefits and the charitable deductions. You conclude it does not. I can't agree with that, Your Honor, for the reason that, and I'm sure you want my reasoning here. Yes. You can't get back more than you put in when you're talking about a CGA. No way. To begin with, you can't get more than 90% of the value of the property and then they award you payments based upon your life expectancy. Now, you have to understand that the people who bought these CGAs, and the appellees state this, were elderly people, people who weren't expected to live a long time, 70s, 80s and 90s. Well, I know, but when you're looking at this, it isn't just, you can't take the facts of who's going to buy it. You have to take the document itself. Well, no, not really, because they were only offered to the elderly. They were picked out by these life insurance agents because solicitation letters were sent out by MidAmerica. Although the sample letters showed someone at age 65 purchasing. I'm not saying that all of them were in 78 or 90, but that's the preponderance of the evidence before us, and I don't think that the appellees disagree with that. These people were picked out because they were elderly. They were picked out because a CGA serves a particular need that no other type of vehicle serves, and it is this. The people who gave money for these CGAs wanted to disinherit their heirs, because in a CGA the money goes to the charity, it can't go to the heirs. Moreover, I think I understand your question, but are you saying that because most people are old that buys it, if they happen to buy 10 or 15, sell them to 35-year-olds, all of a sudden we have a new test that we're going to apply because these 10s went to 35-year-old people? I don't see how you can make that determination to develop whether it's an investment contract based on who buys it, because you don't know. In this particular case, the facts come out that perhaps they're elderly people, but that isn't necessarily going to happen. I don't understand how the subsequent facts make the determination of what is an investment contract. Is there some law that says that? Yes, there is. And what's the case? It's the Howey case. It says that there must be a profit motive. There must be an investment. There must be a profit motive. And it says- I understand that argument. Well, we claim that there is no profit motive here, regardless of how old you are. I think we have your argument at hand, and we're over time. So thank you for your argument, counsel, and we'll hear from the receiver. Good morning. My name is Alice Ann Patton. I'm with the law firm of Gatilla Murphy Anderson, and we represent the receiver. And I have a tendency to talk quickly, so if I start talking fast- Why don't you keep your microphone up? Let's take a deep breath and slow down. Okay. All right. First of all, as to the Ponzi scheme, I don't believe that that issue was raised in the agent's briefs, that this wasn't a Ponzi scheme. I don't believe that that was a basis for the appeal. This was a Ponzi scheme. It's based not only on Mr. Dilley's guilty plea, but also based upon the analysis, the financial analysis provided by the receiver, which is included in the records of the excerpts, which showed that money was coming in, and rather than going into investments, which is what it was supposed to have done, it was being used to pay the next in line's annuitant's payment. It's a classic Ponzi. How do you contend that this particular vehicle or this particular type of transaction is, in fact, meets the Howey test? Okay. Because we have a contract where persons invest money. In fact, the brochures, the Mid-America brochures talk about return on your investment. In addition, this was a common enterprise. There's no dispute here that this money was supposed to have been pooled, all of the annuitant's monies. And Mid-America, in their written materials, including the charitable gift annuities, that they invested their monies in stocks, bonds, money markets, securities, and the only reason to do that would be to generate a profit. And then the management of those investments was all in the hands of Mid-America. Now, there was a reasonable expectation of profits by the investors, the annuitants, because they were expecting a stream of income that would include a portion of the pooled capital that was provided, in addition to sharing in the investment earnings based on that pooled income. So it meets the Howey test that defines an investment contract. Would they ever receive more than their initial investment? Oh, of course they could, depending on how long they lived. So, for example, if you bought a $100,000 charitable gift annuity, and $20,000 was to go to a charity that you had designated, and you lived for 20, 25 years, by the time you got to the end of your life, you could have gone far beyond that $80,000. You were promised that stream of income for your life. Or, in some cases, it was for the life of another. So a spouse might buy a charitable gift annuity and say, I want this not just for me, but I want it for the life of another. The performance on the return was not based on the investment performance. It was based on longevity, right? Well, you're still sharing. You're still sharing. Every time you get a payment, you're still sharing in the interest that had or the appreciation or interest that had been made on the invested funds, every payment. Payments could have been made that could be reasonably attributable to interest or investment. I understand that. But the only way you could make more than you put in is to live longer. It had nothing to do with the investment, right? That's true. But that's true in all annuities. And that's a risk that the issuer is taking, that you will not outlive your amount that you put in and that you're taking the risk that you will. Will the amount that goes to a charity be the same no matter how long you live? I believe that there was supposed to be a portion for the charity. But, in other words, if you outlive the value, there has to have been a portion because you've got that charitable deduction up front. So that amount is set? Yes. Okay. Then I understand your argument. Okay. Now, Mr. or the opposing counsel seems to suggest or is suggesting that this could not be a charitable gift annuity. He seems to suggest that charitable annuities could never excuse me, or were not a security, could never be a security. But if a charitable gift annuity could never be a security, there would be no need to provide an exemption in the Philanthropy Protection Act for charitable gift annuities. So Congress has acknowledged, although it may not have addressed charitable gift annuities in a description of securities, it still has acknowledged that a charitable gift annuity can, in fact, be a security because it's provided for registration exemptions through the Philanthropy Protection Act. And opposing counsel has described how that act would exempt his clients from registration requirements. In order to understand the Philanthropy Protection Act, you have to look at it as a whole. You have to look at the text, and you have to understand why it was that Congress enacted it. And for that, we can look to the House report where it's not obvious from the text itself. So for about 23 years, the SEC had been issuing no-action letters to charities who were selling charitable gift annuities. But there were conditions to that. A couple of the conditions was that it's a bona fide charity. The second condition was that the person selling the charity were volunteers or employees, staff of the charity involved in the fundraising activities. And last, that they weren't receiving commissions. And so litigation eventually ensued that was potentially, it was posing a potential threat to the charities. That is that now they would be subject to the registration requirements in the 33 Act, which requires the registration of securities, in the 34 Act, which requires the registration of persons who sell securities, and in the 1940 Investment Act, which requires the issuer to be registered when selling securities. And so the charities appealed to Congress and said, we want to be able to raise funds through the sale of charitable gift annuities, but these registration requirements would be onerous, and we might not be able to do it then. So Congress looked at what the SEC had been doing for the past 23 years and came up with the Philanthropy Protection Act. And what they said was as to the 33 Act, which is the 78C, 15 U.S.C. 78C, if you're a charitable organization and you're selling the charitable gift annuities, you can be exempt from registering the security itself. But that definition of charity has to comport with the definition of charity in the 1940 Investment Act, which defines charities. And in that Act, which, let me back up a second, the 1940 Investment Act exempts charities from, as an issuer, also from registration. But then it defines charities as charities that are defined in the IRS Code in 26 U.S.C. 170 and 501C3. So if you go to those codes to find out what a charitable organization is, it says a charity that is organized and operated as a charity. North America was organized as a charity, but it was never operated as a charity. From the get-go, it was a Ponzi scheme. So to take Mr. Bentley's argument, he said under the 34 Exchange Act, charitable gift annuities were exempt from registration requirements. That's not true, because they weren't a charity under the definition of a charity in the IRS Code. And so his contention seems to be since they were exempt from registration, which they were not, his clients didn't have to be licensed as sellers. That's not true either, because when Congress provided an exemption for the registration of the security, they also then enacted 78CE1 and 2, which the Act says exemptions for broker-dealers. Broker-dealers are the ones that sell the securities. And here's what Congress said. You're selling a charitable gift annuity, and you are exempt from registration if you are the charity yourself, if you are an officer or director or employee or volunteer of the charity, and you don't receive a commission. And the reason why they had that was they knew when we exempt the sellers from the registration requirements, the sellers no longer have to comport with the standards of the Exchange Act and the Securities Act, and we're a little concerned. You'll find this in footnote 4 of the House report. We're a little concerned. We don't want people running around using overzealous, overaggressive tactics in selling the charitable gift annuities. So we can reduce that risk by saying there's not going to be a profit motivation for you, the seller. There's not going to be a commission. So if you sell 100, you're not going to get rewarded for selling 100 versus 10. So how does this fit in with the agents in this case? Were they an employee of the charity? No, they weren't. They're very, very adamant that they weren't an employee of the charity. They're obviously not an officer or director, and clearly they're not a volunteer because they didn't do this for free. Could they have sold these securities without having been registered as broker-dealers? Yes, under the following conditions. They received nothing because then they would have been a volunteer, or if they received a salary but not a commission because then they would have been an employee. But you won't find in the Act that an insurance agent who's not licensed to sell securities can go ahead and sell them for a commission. In fact, the House report says explicitly we're not saying that the charities can't pay a broker a commission, but if they do, and this is a security, they have to be registered. There's no dispute here that the agents here were not registered. So we know that the charitable gift annuities are securities, which provides a basis for our security fraud claims, our negligence per se claim. In addition, there's a separate reason that supports our negligence per se claim. Not only did they violate the security fraud statute, they violated the registration statutes. So there's two bases to support that judgment. And then the unjust enrichment claim is not dependent on whether this is a security or not. So there is sufficient evidence, and the law supports the judgments, the verdicts that were rendered and the ultimate judgment that was entered in this case. Is there anything else I can answer for you? I was just going to say, and I'm just reminding you that we do have a protective cross appeal. Yes. Okay. Is that all? Yes. Thank you both for your arguments. Thank you. The case history will be submitted. It's very helpful for your briefing and arguments today. We'll be adjourned for the morning.
judges: Wallace, Thomas, Graber